**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**

NO. 5:12-CV-00021-WW

| | | |
|---|---|---|
| WILLIAM M. BLEDSOE and SHARON BLEDSOE,<br><br>Plaintiffs,<br><br>v.<br><br>OCWEN LOAN SERVICING, LLC,<br><br>Defendant. | ) | **ORDER** |

Plaintiff homeowners William M. Bledsoe and Sharon Bledsoe bring this action for monetary and equitable relief against their mortgage service company, defendant Ocwen Loan Servicing, LLC ("Ocwen"). Plaintiffs allege that Ocwen approved a loan modification of their mortgage and accepted reduced payments under the modified loan, but then abruptly revoked the modification, refused to accept Plaintiff's payments, and initiated foreclosure proceedings against them. Plaintiffs contend Ocwen's actions violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"). In addition, Plaintiffs pursue claims of fraud, detrimental reliance, unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1, *et seq.*, and violation of N.C. Gen. Stat. § 75-54. Am. Compl., DE-8. Ocwen seeks summary judgment on all claims. Def.'s Mot. Summ. J., DE-27. Plaintiffs have responded to the motion for summary judgment (DE-32), Ocwen has replied (DE-33), and the matter is ripe for adjudication. By order entered March 27, 2012, upon consent by the parties, this case was

referred for jurisdiction by a magistrate judge to conduct all proceedings. For the reasons set forth herein, Ocwen's motion for summary judgment is granted.

## I. BACKGROUND

The evidence before the Court tends to show the following: On September 10, 2003, Plaintiffs obtained a $100,000.00 loan from Taylor, Bean & Whitaker Mortgage Corporation ("TBW") to refinance the mortgage on their home. Ex. A, DE-28-1, Ex. B, DE-28-2. To that end, Plaintiffs executed a promissory note in favor of TBW secured by a deed of trust for their residence located at 2205 Kelly Road, Apex, North Carolina. Ex. B, DE-28-2, Ex. C, DE-28-3; Dep. William Bledsoe, 7:24, 8:3-7, DE-32-1.

By letter dated August 18, 2009, Ocwen notified Plaintiffs that TBW had sold and transferred Plaintiff's mortgage loan to Ocwen. Ex. D, DE-28-4. Accordingly, the notice directed Plaintiffs to send their monthly mortgage payment to Ocwen, effective August 12, 2009. Soon after acquiring Plaintiff's loan, Ocwen sent Plaintiffs a letter informing them of their eligibility for loan modification under the federal government's Making Home Affordable program.[1] Ex. E, DE-28-5. The proposed effective start date for Plaintiff's "Home Affordable Modification Trial Period Plan" ("HAMP trial plan") was January 1, 2010. Ex. F, DE-28-6. The HAMP trial plan required Plaintiffs to make three trial period payments of $853.51 on or before January 1, 2010; February 1, 2010; and March 1, 2010. The letter cautioned that the trial period plan was only the "first step" towards loan modification:

> TRIAL PERIOD/MODIFICATION AGREEMENT: The Trial Period Plan is the first step. Once we are able to finalize your modified loan terms, we will send you a loan modification agreement ("Modification Agreement"), which will reflect the terms of your modified loan. In addition to successfully completing the

[1] The Making Home Affordable program was launched by the U.S. Department of the Treasury as part of the Troubled Asset Relief Program ("TARP") authorized by Congress in an effort to assist struggling homeowners in the wake of the 2008 financial crisis.

> trial period, you will need to sign and promptly return to us both copies of the Modification Agreement or your loan cannot be modified.

Letter, Nov. 24, 2009, 2, Ex. D, DE-28-5.

Interested in the possibility of loan modification, Plaintiffs sent Ocwen various requested documents. W. Bledsoe Dep. 16:1-5. Ocwen found some of Plaintiffs' documentation to be insufficient, however. For example, copies of tax returns sent by Plaintiffs were not signed. Letter, Jan. 29, 2010, Ex. G, DE-28-7. Other documents apparently never reached Ocwen. Mr. Bledsoe testified of his frustration with the process: "[Ocwen] had been requesting documents that we had already sent, saying we hadn't sent. I sent multiple copies various different times and . . . it just seemed like the ball kept getting dropped on their end." W. Bledsoe Dep. 16:2-8.

Mr. Bledsoe further testified that in early January or February of 2010, he spoke by telephone with Ocwen employee Paul Myers. W. Bledsoe Dep. 14:21-25, 15:21-22. Myers informed him that Plaintiffs had been approved for loan modification, with a $878.51 monthly mortgage payment. Mr. Bledsoe testified he could

> not recall [the conversation] verbatim, but the gist of it was . . . "congratulations, we accepted your loan modification; this is going to be your new payment"; gave me my new interest rate and said that my hard copy . . . would be in the mail, and that's where we got the 878.51 from, and that's why I sent 878.51 every month.

*Id.* at 15:7-13. Mr. Bledsoe understood from Myers that there would be a trial payment plan for three months, after which, "provided [Plaintiffs] did everything correctly," the trial payment "would be [their] new payment." *Id.* at 16:14-15. Myers informed Mr. Bledsoe that Ocwen would send them documents to fill out and return. *Id.* at 15:23-25, 16:1.

By letter dated January 29, 2010, Ocwen notified Plaintiffs that Ocwen had not yet received completed paperwork from Plaintiffs. Letter, Jan. 29, 2010, Ex. G, DE-28-7. Also

enclosed in the letter was a proposed Modification Agreement. The Modification Agreement proposed a total monthly mortgage payment of $855.46, effective April 1, 2010. Ocwen informed Plaintiffs that "[o]nce we have received the required documents listed above together with both original signed copies of the Modification Agreement, we can determine whether you meet all the requirements under the Home Affordable Modification Program." *Id.* The letter further instructed:

> To accept this offer, you must sign and return both copies of the Modification Agreement to us before 4/1/2010. If the Modification Agreement has notary provisions at the end, you must sign both copies before a notary public and return the notarized copies to us. We encourage you to make a copy of all documents for your records. If you do not send both signed copies of the Modification Agreement by the above date, you must contact us if you still wish to be considered for this program and have your loan modified.

*Id.* at 2.

Section Two of the proposed Modification Agreement, enclosed in the January 29th letter, provides as follows:

> 2. **Acknowledgements and Preconditions to Modification**. I understand and acknowledge that:
>
> D. TIME IS OF THE ESSENCE under this Agreement;
>
> E. If prior to the Modification Effective Date as set forth in Section 3 the Servicer determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Agreement will terminate. In this event, the Servicer will have all of the rights and remedies provided by the Loan Documents; and
>
> F. I understand that the Loan Documents will not be modified unless and until (i) I receive from the Servicer a copy of this Agreement signed by the Servicer, and (ii) the Modification Effective Date (as defined in Section 3) has occurred. I further understand and agree that the Servicer will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Agreement.

Modification Agreement 2, Ex. G, DE-28-7.

Mr. Bledsoe spoke again with Ocwen employee Myers on February 25, 2010 and requested that Myers re-send the Modification Agreement. Ex. H, 000311, DE-28-8. Accordingly, Ocwen mailed another copy of the proposed Modification Agreement to Plaintiffs on or about March 1, 2010. *Id.* On April 6th and 16th, 2010, Myers contacted Mr. Bledsoe and told him that Ocwen had not yet received the two original signed copies of the Modification Agreement from Plaintiffs. *Id.* at 000309. Mr. Bledsoe stated that Plaintiffs had scanned the Modification Agreement and e-mailed it to Ocwen. Myers advised Mr. Bledsoe that Ocwen needed two original signed documents; e-mail or facsimile was insufficient. Mr. Bledsoe said he would send Ocwen the two original signed documents by overnight delivery.

Ocwen mailed another copy of the Modification Agreement to Plaintiffs on April 22, 2010. *Id.* at 000308. On or about May 28, 2010, Ocwen closed the HAMP offer because the requested documents and signed Modification Agreement had not been received from Plaintiffs. *Id.* at 000307.

In October of 2010, Ocwen began sending Plaintiffs notices of default and 45-day pre-foreclosure notices informing them that they were behind on their monthly mortgage payments and were in default. Ex. I, DE-28-9; W. Bledsoe Dep. 38-39; Ex. K, S. Bledsoe Dep. 23:11-13, DE-28-11. Plaintiffs also received monthly invoices from Ocwen notifying them of past due amounts due immediately. Plaintiffs believed these notices were incorrect, however, because of the $878 payment they sent each month. Mr. Bledsoe testified that he did not "understand how [Ocwen was] getting a past due amount when we made our payments each month." Dep. W. Bledsoe, 36:1-2. Mrs. Bledsoe testified to her understanding of the past due amounts:

> My hope was that they—we were going to get the whole modification thing figured out because they had told us that we had it and that's what we were

> paying all along, and that's what they had been accepting. So we were going to – it was going to come wiped clean because we were paying what we had been told we could pay.

Dep. S. Bledsoe, 26:11-17, Ex. K, DE-28-11. Mr. Bledsoe made multiple unsuccessful attempts to contact Ocwen about the account, but no one at Ocwen returned his telephone calls. Dep. W. Bledsoe 36:7-17. Eventually, Plaintiffs began simply forwarding these notices to their attorney.

Ocwen employee Manoranjan Dev Nellore contacted Plaintiffs by telephone on January 18, 2011 about the HAMP program. Ex. H, 000291, DE-28-8. Nellore informed Mr. Bledsoe that in order to qualify for a new HAMP plan, Plaintiffs would need to send an updated HAMP package with their latest income documentation. Mr. Bledsoe told Nellore that he wanted the previous HAMP plan honored and noted that Ocwen had been accepting Plaintiffs' modified payments each month. Nellore explained that the previous HAMP offer had been closed because Ocwen had not received the signed Modification Agreement from Plaintiffs before April 1, 2010. Mr. Bledsoe stated that he had hired counsel and that Ocwen should discuss the loan modification with his attorney. *Id.*

In April 2011, at which time Plaintiffs' past due balance exceeded $10,000, Ocwen refused to accept Plaintiffs' payment of $900.00 because it was insufficient to cure the default on the loan. Ex. H, 000283, DE-28-8. Ocwen subsequently commenced a foreclosure action against Plaintiffs.

Plaintiffs filed a complaint against Ocwen in Superior Court, Wake County, on December 8, 2011. (DE-1). Ocwen subsequently removed the case to this Court based on diversity of the parties. Plaintiffs filed an amended complaint in this Court on January 31, 2012. (DE-8). The amended complaint alleges causes of action for (1) fraud, (2) unfair trade practices in violation of N.C. Gen. Stat. § 75-1, *et. seq.*, (3) detrimental reliance, (4) violations of the Fair Debt

Collection Practices Act, 15 U.S.C. § 1692, *et. seq.*, and (5) deceptive representations by a debt collector in violation of N.C. Gen. Stat. § 75-54. Plaintiffs also seek punitive damages. Ocwen contends it is entitled to judgment as a matter of law on each of Plaintiffs' claims.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in a light most favorable to the non-moving party. *See* Anderson, 477 U.S. at 255. To withstand a motion for summary judgment, the non-moving party may not rest on the allegations, Anderson, 477 U.S. at 248, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation omitted & emphasis removed); *see also* Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the non-moving party's] case." (internal quotation marks omitted)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

### B. Fraud

This Court is sitting in diversity and must apply North Carolina substantive law to Plaintiffs' state law claims. *See* Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr., 594 F.3d 285, 290-91 (4th Cir. 2010). Under North Carolina law, the essential elements of

fraud are: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." Ragsdale v. Kennedy, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974); *see also* Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992). In addition, reliance on the alleged misrepresentation must be reasonable. Johnson v. Owens, 263 N.C. 754, 756, 140 S.E.2d 311, 313 (1965); State Properties, LLC v. Ray, 155 N.C. App. 65, 72, 574 S.E.2d 180, 186 (2002), *disc. review denied*, 356 N.C. 694, 577 S.E.2d 889 (2003). While the reasonableness of a party's reliance is usually a question for the jury, where the facts unmistakably support but one conclusion, summary judgment is appropriate. Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP, 350 N.C. 214, 513 S.E.2d 320 (1999).

Here, Plaintiffs contend Ocwen employee Myers falsely informed Mr. Bledsoe during their January/February 2010 telephone conversation that Plaintiffs had been approved for loan modification, with a modified monthly payment of $878.51. Believing that they had been approved for loan modification, Plaintiffs began sending the modified payment each month to Ocwen. Account statements offered by Plaintiffs confirm that they sent Ocwen $878.51 each month beginning January 26, 2010. Ex. B, DE-32-2. Plaintiffs argue that Ocwen's acceptance of these modified payments, coupled with Myers' misleading statements, "induc[ed] them to believe they were in accord with the modification." Pls.' Resp. 3, DE-32.

Viewing the evidence in the light most favorable to Plaintiffs, there is insufficient evidence of fraud to withstand the present motion for summary judgment. First, Plaintiffs forecast little evidence of a false representation or concealment of a material fact by Ocwen. Mr. Bledsoe testified that in early January or February of 2010, Myers told him that Ocwen had "accepted [Plaintiffs'] loan modification" and gave them "a new payment." Mr. Bledsoe could

not remember the conversation precisely, only the "gist" of it. However, Mr. Bledsoe understood from Myers that there would be a trial payment plan for three months, after which, "provided [Plaintiffs] did everything correctly," the trial payment "would be [their] new payment." Myers informed Mr. Bledsoe that Ocwen would send them documents to fill out and return. These documents clearly informed and required Plaintiffs to acknowledge that the HAMP trial plan

> is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed. I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the requirements under this Plan.

Mr. Bledsoe could not recall receiving any written notification from Ocwen that the Modification Agreement had been approved, W. Bledsoe Dep. at 17-18, and Myers was the only Ocwen employee with whom Mr. Bledsoe spoke regarding the trial modification program. *Id.* at 19:13-21. When Mr. Bledsoe spoke with Myers again in April, Myers told him Ocwen had not yet received the Modification Agreement signed by Plaintiffs. Notably, although Mr. Bledsoe testified that Plaintiffs sent Ocwen several signed copies of the proposed Modification Agreement, no such document appears in the record. Nor is there any documented evidence of e-mails sent by Plaintiffs to Ocwen. Plaintiffs acknowledge that they received numerous notices from Ocwen informing them that they were in default, as well as invoices showing past payment due immediately.

The evidence summarized above, viewed in the light most favorable to Plaintiffs, fails to establish that anyone at Ocwen falsely informed Plaintiffs that their loan documents had been successfully modified. Instead, the evidence indicates that Plaintiffs were approved for a trial modification only. Because Plaintiffs have presented insufficient evidence of any false

representation or concealment of a material fact, Ocwen is entitled to summary judgment on Plaintiffs' claim of fraud. *See* RD&J Props. v. Lauralea-Dilton Enters., LLC, 165 N.C. App. 737, 745, 600 S.E.2d 492, 498-99 (2004) ("'If defendant effectively refutes even one element [of fraud], summary judgment is proper.'" (quoting Ramsey v. Keever's Used Cars, 92 N.C. App. 187, 191, 374 S.E.2d 135, 137 (1988))). Plaintiffs' claim of fraud further fails because they have presented no evidence of intent to deceive on Ocwen or Myers' part. "Without the element of intent to deceive, the required scienter for fraud is not present." Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323 N.C. 559, 568, 374 S.E.2d 385, 391 (1988); *see also* Media Network, Inc., v. Long Haymes Carr, Inc., __ N.C. App. __, __, 678 S.E.2d 671, 683 (2009) ("Tort actions for deceit or fraud require showing intent to deceive or scienter, which [is] [a] heavy burden[] of proof."); RD&J Props., 165 N.C. App. at 745, 600 S.E.2d at 498 ("The required scienter for fraud is not present without both knowledge and an intent to deceive, manipulate, or defraud.").

Finally, and perhaps most critically, Plaintiffs have failed to forecast evidence demonstrating that their reliance on the alleged misrepresentation was reasonable. Even if the initial telephone conversation with Myers in January/February of 2010 gave Mr. Bledsoe the mistaken impression that Plaintiffs had been approved for permanent loan modification, the surrounding circumstances and events that followed demanded reassessment of this belief. Ocwen's letter dated November 29, 2009 informed Plaintiffs that their loan could not be modified until they completed the trial plan and a Modification Agreement was in place: "In addition to successfully completing the trial period, you will need to sign and promptly return to us both copies of the Modification Agreement or your loan cannot be modified." The terms of the HAMP trial plan clearly and plainly stated that Plaintiffs' loan would not be modified until

Plaintiffs received "a fully executed Modification Agreement." The January 29th letter accompanying the proposed Modification Agreement likewise informed Plaintiffs that "[t]o accept this offer, you must sign and return both copies of the Modification Agreement to us before 4/1/2010." The Modification Agreement itself stated that the loan documents would not be modified "unless and until (i) [Plaintiffs] receive from the Servicer a copy of this Agreement signed by the Servicer." Myers twice spoke with Mr. Bledsoe in April of 2010 and told him that Ocwen had not yet received the two original signed copies of the Modification Agreement from Plaintiffs. Myers further informed Mr. Bledsoe that Ocwen needed original copies; faxed or e-mailed documents could not be accepted. Thus, Plaintiffs understood in April of 2010 that Ocwen had not received the Modification Agreement from Plaintiffs before the April 1, 2010 deadline. Plaintiffs never received an executed Modification Agreement from Ocwen, and no copies of the Modification Agreement signed by Plaintiffs appear in the record. Meanwhile, Ocwen sent Plaintiffs multiple notices and invoices indicating that they were behind in their loan payments. These notices and invoices showed no modification to Plaintiffs' loan.

Plaintiffs complain that Ocwen's invoices contained "differing amounts, confusing language, and unexplained changes in amounts." Pls.' Resp. 4, DE-32. Plaintiffs do not specify, however, what language they found confusing, or which amounts differed or changed from month to month. Review of the invoices shows that, consistent with the HAMP trial period plan, Plaintiffs' mortgage payment for January, February, and March of 2010 was $853.51. These payments were listed on the invoices as "Forbearance Payments." The ordinary definition of "forbearance" in this context is "[t]he act of a creditor who refrains from enforcing a debt when it falls due." *Webster's II New College Dictionary* 437 (1995). Thus, Plaintiffs were on notice that Ocwen was "forbearing" from collecting the amount actually owed by Plaintiffs. After

March 1, 2010, in accordance with the HAMP trial period, the invoices no longer listed any "Forbearance Payments." Contrary to Plaintiffs' implied argument, the invoices never directed Plaintiffs to pay $878.51 as a modified payment; instead, the $878.51 amount listed on the invoice merely reflected the amount Plaintiffs in fact paid the previous month. As such, the invoices do not strengthen, but rather undermine Plaintiffs' argument that they reasonably believed their loan had been modified.

The Supreme Court of North Carolina has stated that

> [t]he right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him. The policy of the courts is, on the one hand, to suppress fraud and, on the other, not to encourage negligence and inattention to one's own interest.

Calloway v. Wyatt, 246 N.C. 129, 135, 97 S.E.2d 881, 886 (1957). With such overwhelming evidence indicating that no loan modification had occurred, it cannot be said that Plaintiffs justifiably relied upon the alleged misrepresentation by Myers. *See* Cobb v. Pennsylvania Life Ins. Co., __ N.C. App. __, 715 S.E.2d 541 550 (2011) (holding that the trial court properly granted summary judgment to defendant insurance company on fraud claim because the plaintiff's reliance on alleged false representations made by an agent regarding coverage was unjustified where the plaintiff failed to review the plainly defined terms of the policy he purchased); Area Landscaping, Inc. v. Glaxo-Wellcome, Inc., 160 N.C. App. 520, 527, 586 S.E.2d 507, 512 (2003) (holding that the plaintiff's reliance was unreasonable as a matter of law where the plaintiff's understanding and belief that the terms of its contract bid would be kept confidential by the defendant conflicted with explicit terms set forth in the defendant's letter and proposal); *accord* Angell v. Kelly, No. 1:01-CV-00435, 2006 U.S. Dist. LEXIS 87567, at *17-28 (M.D.N.C. Nov. 30, 2006) (granting summary judgment on North Carolina fraud claim where

the plaintiffs failed to establish reasonable reliance as a matter of law). As such, Ocwen is entitled to summary judgment on Plaintiffs' claim of fraud.

**C. Unfair or Deceptive Trade Practices**

North Carolina General Statute section 75-1.1(a) states that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." To prevail on a claim of unfair and deceptive trade practice a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business. Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397, 403 (1981). A practice is deceptive if it has the capacity or tendency to deceive the average consumer, but proof of actual deception is not required. Johnson v. Phoenix Mut. Life Ins. Co., 300 N.C. 247, 265-66, 266 S.E.2d 610, 622 (1980). A practice is unfair when it offends established public policy as well as when the practice is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Id.* at 263, 266 S.E.2d at 621. The determination as to whether an act is unfair or deceptive is a question of law for the court. Gray v. N.C. Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000).

Here, Plaintiffs have not forecast sufficient evidence by which a jury could find that the statements made by Myers as described by Mr. Bledsoe could have created the likelihood of deception where Plaintiffs possessed numerous documents clearly and plainly stating that their loan could not be modified until an executed Modification Agreement was in place, Plaintiffs never received a Modification Agreement signed by Ocwen, and were informed after the April 1, 2010 deadline that Ocwen had not received a signed Modification Agreement from Plaintiffs. Further, Plaintiffs received numerous notices and invoices from Ocwen indicating that the loan

had not been modified, and that Plaintiffs were in default. Plaintiffs chose to disregard this information at their peril. Nothing in these facts is "immoral, unethical, oppressive, unscrupulous, or substantially injurious." Myers' alleged misrepresentation regarding Plaintiffs' loan modification, in the face of the documents available to Plaintiffs showing this representation to be false, was not an act "likely to deceive" the "average consumer." Under the circumstances presented here, Plaintiffs were unreasonable in relying on the alleged misrepresentation. *See* Spartan Leasing Inc. v. Pollard, 101 N.C. App. 450, 461, 400 S.E.2d 476, 482 (1991) (granting summary judgment on the defendant's counterclaim of unfair and deceptive trade practices where reliance on the alleged misrepresentation was unreasonable as a matter of law). Ocwen's conduct, thus, did not violate N.C. Gen. Stat. § 75-1.1, and Ocwen is entitled to summary judgment on this claim.

**D. Detrimental Reliance/Equitable Estoppel**

In their amended complaint, Plaintiffs indicate they are seeking relief based on "detrimental reliance." Plaintiffs now concede that "detrimental reliance" is not a cause of action, but nevertheless request that the Court construe the claim as one of equitable estoppel. Equitable estoppel is usually invoked as a defense, however, State v. Rich Food Servs. Inc., 139 N.C. App. 691, 703, 535 S.E.2d 84 (2000), and it is not clear that the doctrine of equitable estoppel supports an independent cause of action. In any event, the party asserting equitable estoppel must show (1) a lack of both the knowledge and the means of knowledge as to the real facts in question; and (2) reliance upon the conduct of the party sought to be estopped to his prejudice. *Id.* (citing Friedland v. Gales, 131 N.C. App. 802, 807, 509 S.E.2d 793, 796-97 (1998)); *see generally* Gore v. Myrtle/Mueller, 362 N.C. 27, 33, 653 S.E.2d 400, 405 (2007). In this case, it cannot be said that Plaintiffs lacked knowledge and the means of knowledge as to the

real facts regarding their loan modification. As discussed *supra*, Plaintiffs possessed numerous documents explaining in plain terms that their loan could not be modified until a Modification Agreement was executed. No Modification Agreement was executed, and Plaintiffs' monthly mortgage statements reflected no modification. Accordingly, Plaintiffs have failed to show grounds for invocation of the doctrine of equitable estoppel.

**E. North Carolina Debt Collection Act**

Plaintiffs argue that Ocwen's actions violated N.C. Gen. Stat. § 75-54, which is part of the North Carolina Debt Collection Act ("NCDCA"). The NCDCA proscribes certain activities in the area of debt collection. N.C. Gen. Stat. §§ 75-51 to -55. The specific conduct delineated as prohibited in N.C. Gen. Stat. § 75-54 are examples of unfair practices proscribed by N.C. Gen. Stat. § 75-1.1. *See* N.C. Gen. Stat. § 75-56. Under N.C. Gen. Stat. § 75-54, unfair practices include conduct which is fraudulent, deceptive or misleading in debt collection. To prevail on a claim for violation of this section, one need not show deliberate acts of deceit or bad faith, but must nevertheless demonstrate that the act complained of "'possessed the tendency or capacity to mislead, or created the likelihood of deception.'" Forsyth Memorial Hosp., Inc. v. Contreras, 107 N.C. App. 611, 614, 421 S.E.2d 167, 170 (1992) (quoting Overstreet v. Brookland, Inc., 52 N.C. App. 444, 279 S.E.2d 1 (1981)). However, for the same reasons set forth in Section C discussing Plaintiff's inability to show unfair trade practices, Plaintiffs have likewise not forecast sufficient evidence to show that Ocwen misrepresented the debt owed by Plaintiffs or committed any act likely to deceive. Ocwen's motion for summary judgment on this claim is accordingly granted.

**F. Fair Debt Collection Practices Act**

The Fair Debt Collection Practices Act (FDCPA), codified at 15 U.S.C. § 1692, proscribes certain enumerated activities by "debt collectors." Under the FDCPA, "debt collector" is defined as:

> any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6). The FDCPA only applies to those who regularly collect debts on behalf of others; it does not apply to creditors trying to collect their own debts. Thus, "the law is well-settled . . . that creditors, mortgagors, and mortgage servicing companies are not debt collectors and are statutorily exempt from liability under the FDCPA." Scott v. Wells Fargo Home Mortg., Inc., 326 F. Supp. 2d 709, 718 (E.D. Va. 2003). Plaintiffs do not contest this issue, and summary judgment on this claim is therefore appropriate.

## III. CONCLUSION

Plaintiffs have failed to forecast sufficient evidence to support their allegations against Ocwen. Because no genuine issues of material fact exist regarding Plaintiff's claims against Ocwen, the motion for summary judgment (DE-27) is hereby GRANTED.

DONE AND ORDERED in Chambers at Raleigh, North Carolina on Friday, February 1, 2013.

WILLIAM A. WEBB
UNITED STATES MAGISTRATE JUDGE